AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>6713 Agra Street, Commerce, California 90040 | )<br>)<br>)<br>)<br>)<br>)   Case No.  2:19-MJ-05228 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Central_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| | 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) |

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joshua Gilliano, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____12/09/2019_____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises located at 6713 Agra Street, Commerce, California, 90040 (the "SUBJECT PREMISES"). The SUBJECT PREMISES is a single story residence, with a green stucco finish and white wood trim. The SUBJECT PREMISES has a grey composite roof and attached garage with a white metal roll-up door. Red brick pillars and white wrought iron fencing enclose the front yard and driveway of the SUBJECT PREMISES, accessible by a pedestrian gate and a driveway gate. The numbers "6 13[3]" are visible affixed to the exterior of the residence, to the left of the front door, and "6713" painted on the curb left of the driveway. The search shall include all sheds and storage units, and any vehicles parked on the curtilage of the SUBJECT PREMISES.

---

[3] It appears that the "7" has fallen off.

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.    The items to be seized are the fruits,
instrumentalities, and evidence of violations of Title 21,
United States Code, Section 846 (Conspiracy to Distribute and
Possess with Intent to Distribute Controlled Substances) and
Title 21, United States Code, Section 841(a)(1) (Distribution
and Possession with Intent to Distribute Controlled Substances)
(collectively, the "Subject Offenses"), namely:

a.    Any controlled substance, including, but not
limited to fentanyl;

b.    Any items, paraphernalia, or precursors commonly
used for manufacturing, distributing, packaging, and/or weighing
controlled substances, including, but not limited to: cutting
agents, plastic baggies, hot plates, beakers, pill presses, and
scales and other weighing devices;

c.    Any items used in the packaging of currency for
consolidation and transportation, including, but not limited to:
money-counting machines, money wrappers, rubber bands, duct tape
or wrapping tape, plastic wrap, and plastic sealing machines;

d.    Any records, documents, programs, applications,
or materials showing payment, receipt, concealment, transfer, or
movement of money generated from the sale of fentanyl or other
controlled substances, including but not limited to: bank
account records, wire transfer records, bank statements, pay-owe
sheets, receipts, safe deposit box keys and records, money

containers, financial records, and notes, including documents written in vague or coded language;

    e.    Any drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, eighteen, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

    f.    Any United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks and traveler's checks);

    g.    Any records, documents, programs, applications, or materials reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items;

    h.    Any records, documents, programs, applications, or materials reflecting the names, addresses, telephone numbers, or communications of members or associates involved in drug trafficking activities, including but not limited to: personal telephone books, address books, telephone bills, photographs, videotapes, facsimiles, personal notes, receipts, and documents;

    i.    Any indicia of occupancy, residency, or ownership of the SUBJECT PREMISES and things described in the warrant, including, but not limited to: forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing; and

ii

a.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),

iii

SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

       e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

       f.    Contents of any calendar or date book;

       g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

       h.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

       i.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

       i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

       ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

   iii. evidence of the attachment of other devices;

   iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

   v.   evidence of the times the device was used;

   vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

   vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

   viii.   records of or information about
Internet Protocol addresses used by the device;

   ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

 2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

      b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

vii

was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

     a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

     b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

     c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

     d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

     e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

     f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

     g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, law enforcement is permitted to: (1) depress BARELA's thumb- and/or

ix

fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of BARELA's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

## AFFIDAVIT

I, Joshua Gilliano, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search the 6713 Agra Street, Commerce, California 90040 (the "SUBJECT PREMISES"), as described more fully in Attachment A.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3.    I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA").  I have been employed by the DEA since April 2019.  I am currently assigned to the

DEA's Los Angeles Field Division, Southern California Drug Task
Force, High Intensity Drug Trafficking Area, Group 42 which is
comprised of agents and officers from federal, state, and local
agencies who are assigned to investigate large-scale drug
trafficking.

4.     During the course of my employment with the DEA, I
have received several hundred hours of comprehensive, formal
instruction on topics such as drug identification, money
laundering techniques, patterns of drug trafficking, complex
conspiracies, the exploitation of drug traffickers'
telecommunications devices, surveillance, and other
investigative techniques.  I have assisted in investigations
into the unlawful importation, manufacture, possession with
intent to distribute, and distribution of drugs and other
controlled substances, and conspiracies involving drugs and
controlled substance offenses.  I have been involved in drug-
related surveillances that resulted in the seizure of drugs and
other evidence.  I have used a variety of investigative
techniques and resources, including, but not limited to,
surveillance, confidential sources, undercover operations, and
wire intercept communications analysis in Title III wiretap
investigations.

5.     In addition, I am presently working with SA Robert
Thomas, who has been employed by DEA since November 2009.
During SA Thomas's employment with DEA, he has conducted
numerous investigations involving unlawful importation,
exportation, manufacture, possession with intent to distribute

2

and distribution of narcotics, the laundering of narcotics proceeds and monetary instruments derived from narcotics activities, and conspiracies associated with narcotics offenses.

6.    Based on the above training and experience, and conversations with SA Thomas, I have a thorough working knowledge of the means and methods used by persons involved in the use, possession, transportation, distribution and sale of controlled substances and the motivation of persons involved in these crimes.

### III. **SUMMARY OF PROBABLE CAUSE**

7.    On two separate occasions, on August 23 and on December 4, 2019, Manuel Angelo BARELA ("BARELA") sold quantities of counterfeit OxyContin to a confidential source working for the San Gabriel Police Department ("SGPD") (the "CS"), who was posing as a customer.[1]  Laboratory tests confirmed that 18 pills sold by BARELA to the CS on August 23, 2019 contained fentanyl.  Subsequently, 28 pills sold by BARELA to the CS on December 4, 2019, while still pending lab analysis, are consistent in size, shape, and color, with the previous seizure.  In both of these instances, BARELA both exited from and returned to the SUBJECT PREMISES before and after these

---

[1] The CS is a subject in an ongoing, uncharged federal narcotics investigation, suspected of distributing narcotics including fentanyl, who is cooperating with the SGPD and DEA in return for unspecified sentencing consideration. The CS has received no monetary compensation or other benefits from the DEA or SGPD. The CS has no adult or juvenile convictions.  The information provided by the CS has been corroborated by law enforcement by surveillance and verification through public and law enforcement databases.

transactions.  In addition, based on records checks, I believe that BARELA lives at the SUBJECT PREMISES.

### IV.  STATEMENT OF PROBABLE CAUSE

8.  Based on my training and experience, investigation in this case, personal observations as part of the surveillance team, review of law enforcement reports, review of text messages, and conversations with other law enforcement officers and the CS, I am aware of the following:

#### A.  BARELA Agrees to Sell Pills to the CS

9.  From SA Thomas's conversations with the CS and review of the CS's text messages, I know that on or about August 22, 2019, BARELA and the CS, who was posing as an illicit pill customer, negotiated the sale of 18 pills for $200.  BARELA had sold illicit pills of apparent OxyContin to the CS on prior instances, and the CS understood that BARELA understood the 18 pills would also be apparent OxyContin.

10.  At the direction of law enforcement agents, the CS discussed the details of this transaction with BARELA in a series of recorded text messages.  BARELA and the CS agreed to meet on August 23, 2019 for the sale.  The location for this transaction, though not specifically discussed, was the corner of Agra Street and Emil Avenue in Commerce, California 90040 (the "Corner").  According to the CS, BARELA and the CS would typically conduct the sales at the Corner, unless agreed otherwise.  I know from personal observation that the SUBJECT PREMISES is the second residence on Agra Street east of the Corner.

4

**B.    BARELA Sells 18 Pills to the CS on August 23, 2019**

11.    Based on SA Thomas's conversations with other law
enforcement officers and personal observations, I know that law
enforcement officers searched the CS and his/her car for
narcotics and other contraband immediately prior to the
scheduled drug transaction with BARELA on or about August 23,
2019.  Agents found no narcotics or contraband and provided the
CS with $200 to complete the transaction with BARELA.

12.    Based on SA Thomas' observations and review of text
messages on the CS's phone, I am aware that on or about August
23, 2019, at approximately 12:15 p.m., the CS received a text
message from BARELA telling the CS that he/she could come by
after 1:00 in the afternoon.

13.    Based on SA Thomas's personal observations as part of
the surveillance team, and according to SA Thomas's
conversations with the CS and SA Thomas's review of text
messages, I know that the CS arrived to the corner at
approximately 1:30 p.m.  The CS then texted BARELA that the CS
had arrived and BARELA responded for the CS to park at the
corner.  At approximately 1:39 p.m., BARELA informed the CS that
BARELA was on his way to meet the CS.

14.    Based on my conversations with other law enforcement
officers, SA Thomas's conversations with the CS, and SA Thomas's
personal observations, I am aware that at approximately 1:40
p.m., officers on the surveillance team, Task Force Officers
Barraza and Oeland, saw BARELA exit the SUBJECT PREMISES.
BARELA walked from the north side of Agra Street, where the

5

SUBJECT PREMISES sits, to the south side of the street opposite the SUBJECT PREMISES and waited for a couple of minutes.  BARELA then walked towards the CS's vehicle.  Surveillance lost sight of BARELA for approximately 45 seconds as BARELA approached the passenger side of the CS's vehicle.

15.  Based on SA Thomas's discussion with the CS and SA Thomas' personal observations, I know that after approaching the passenger side of the CS's vehicle, BARELA handed the CS 18 pills in a plastic Ziploc-style baggie, in return for $200.  Task Force Officer Mallette and SA Thomas saw BARELA walking away from the front passenger window back towards the SUBJECT PREMISES as the CS's vehicle departed the location after the completion of the transaction.  Task Force Officer Oeland then saw that BARELA walked back to the area of the SUBJECT PREMISES and entered the property of the SUBJECT PREMISES through the pedestrian gate.

16.  Based on my conversations with other law enforcement officers and SA Thomas' personal observations, I know that after the transaction, law enforcement officers again searched the CS and his/her car for narcotics and other contraband.  The officers noted that the CS no longer had the $200 in his/her possession and instead had 18 pills in a plastic Ziploc-style baggie.

**C.  The Pills that BARELA Sold the CS Contained Fentanyl**

17.  Based on my conversations with other agents and review of investigative reports, I know that law enforcement officers conducted a preliminary test of the pills using a MX908 Mass

Spectrometer and found that the pills tested positive for acetaminophen.  Pharmaceutical oxycodone does not contain acetaminophen, which indicated to me that these are counterfeit pills.  Based on my training and experience, I know that acetaminophen is a common binder for fentanyl in counterfeit pills.

18.   On August 26, 2019, the 18 pills that BARELA sold to the CS for $200 were sent to the DEA Southwest Regional Laboratory for forensic testing and further analysis.

19.   On or about September 11, 2019, SA Thomas received a report from the DEA Southwest Regional Laboratory which stated that the 18 pills sold by BARELA to the CS had been subjected to a gas chromatography analysis, and tested positive for Acetaminophen and N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly known as Fentanyl.

**D.   BARELA Sells 28 Pills to CS on December 4, 2019**

20.   On December 4, 2019, at the direction of law enforcement, the CS contacted BARELA via text message stating "Can you serve me."  BARELA replied "Yea."  CS stated to BARELA, "I have 300."  No specific drug type or quantity was discussed during this text message exchange.

21.   I searched the CS for narcotics and other contraband with negative results.  The CS was provided with $300 to purchase pills from BARELA.  SA Thomas and I fitted the CS with an audio recording device, and SA Thomas and I transported the CS to the area of the SUBJECT PREMISES.

22.   Once in the area, the CS texted BARELA "Here."  BARELA responded "Walk up" at which time the CS walked up directly in front of the SUBJECT PREMISES.  The CS's actions were observed by surveillance units in the area.  Surveillance units observed BARELA meet the CS at the pedestrian gate in the front yard of the SUBJECT PREMISES.  Surveillance units then saw a hand-to-hand transaction take place between the CS and BARELA.  The CS then departed the area on foot, and surveillance saw BARELA returning to the SUBJECT PREMISES.

23.   The audio recording device worn by the CS captured BARELA stating to the CS, "Let me know how you like them dawg, because if they don't hit I can just get different ones, you know?"

24.   SA Thomas and I picked up the CS at the corner of Emil Avenue and East Gage Avenue.  I immediately took possession of 28 pills from the CS.  I again searched the CS for narcotics and other contraband after the transaction.  The CS no longer had the $300 in his/her possession and had no other drugs or contraband.

25.   Laboratory tests for these 28 pills are still pending. The pills are consistent in appearance with the 18 pills BARELA sold earlier that contained fentanyl.

**E.   Further Investigation of the SUBJECT PREMISES**

26.   According to BARELA's most recent California Department of Motor Vehicle ("DMV") issued driver's license, which was issued in October 2014, BARELA resides at the SUBJECT PREMISES.  Additionally, a public records check reveals that the

SUBJECT PREMISES is listed as BARELA's residence as of August 2019 and the subscriber address for the phone used by BARELA to arrange the drug sale to the CS is that of the SUBJECT PREMISES.

27. In addition, as stated above, the CS was able to identify the SUBJECT PREMISES as the location where he/she obtained his/her narcotics; and BARELA both exited from and returned to the SUBJECT PREMISES following the transactions on both August 23, 2019, and December 4, 2019.

## V. TRAINING AND EXPERIENCE REGARDING EVIDENCE OF THE SUBJECT OFFENSES

28. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug traffickers will frequently keep records, documents, and other evidence pertinent to their drug trafficking activities at their residence and areas associated with their residence. Individuals involved in drug trafficking often conceal evidence of their drug trafficking in their residences, as well as garages, carports, outbuildings, vehicles, and other surrounding areas to which they have ready access.

b. Drug traffickers often keep drugs and drug proceeds in places where they have ready access and control such as in their residence or car and in hidden compartments or areas in their residences and cars to conceal them from others. They also often keep other items related to their drug trafficking

activities, such as digital scales, cutting agents, and packaging materials.

        c.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

        d.    Individuals involved in drug trafficking generally sell narcotics for cash, as BARELA did to the CS in this case.  Therefore, drug traffickers typically have significant amounts of cash on hand, as proceeds of sales, to purchase their own supplies, or as profits from their drug trafficking activities.  In addition, drug traffickers often have other assets generated by their narcotics business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.  Drug traffickers often keep these items, and records reflecting their purchase or sale, such as automobile titles or deeds to property, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in drug trafficking activities, in their digital devices, residences, offices, garages, storage buildings, automobiles, and safe deposit boxes.

e.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.  Drug traffickers also often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices in their residences and cars.

f.   Drug traffickers keep records of their illegal activities for a period of time extending beyond the time during which they actually possesses particular controlled substances, in order to maintain contact with criminal associates for future drug transactions, and to have records of prior transactions for which, for example, they might still be owed payment, or might owe someone else money.

g.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to

11

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

14

31.    The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

       a.    Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

       b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

32.    Thus, the warrant I am applying for would permit law
enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress BARELA thumb- and/or fingers on the

15

device(s); and (2) hold the device(s) in front of BARELA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

33.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

34.   For all the reasons described above, there is probable cause that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found at the SUBJECT PREMISES, as described in Attachment A.


_____
Joshua Gilliano
Special Agent, Drug
Enforcement Administration


Subscribed to and sworn before me
this _____ day of December, 2019.


_____
HONORABLE JEAN P. ROSENBLUTH
U.S. MAGISTRATE JUDGE

16